**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00591 (CKK)** |
| **v.** | : | |
| | : | |
| **OLIVER SARKO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Oliver Sarko ("Sarko") to thirty days incarceration, three years' probation, 60 hours of community service, and $500 restitution.[1]

I.      **Introduction**

The defendant, Oliver Sarko, knowingly and willfully participated in the January 6, 2021 attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

---

[1] "A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10). *See generally* Govt's Sentencing Mem., *United States v. Brian Stenz*, 1:21-CR-00456 (BAH), ECF No. 32 at 24-33."

Sarko pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of thirty days incarceration is appropriate in this case because: (1) Sarko observed rioters make a violent entry into the U.S. Capitol, including by breaking a window and then climbing through the window (2) Sarko proudly recorded himself outside of the U.S. Capitol, exclaiming "We  are storming the Capitol out here"; "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"; "We're actually breaking in right now"; and "Fight for Trump!"; (4) Sarko posted video of the recording to his Snapchat account, "osark21"; (5) Sarko entered the office of United States Senator Jeff Merkley without authorization; (6) Sarko entered a room used by visiting spouses of U.S. Senators and members of the House of Representatives without authorization; (7) Sarko chanted and cheered while approaching the U.S. Capitol and posted a video to Snapchat of his conduct inside and outside of the U.S. Capitol; (8) the defendant has adult criminal convictions for shoplifting, attempted illegal conveyance or possession in a school safety zone and obstruction of official business, as well as violations for traffic infractions; and (9) the defendant has expressed remorse for his conduct on January 6.

Even if he didn't personally engage in violence or property destruction during the riot, before entering the Capitol on January 6, Sarko celebrated the violence of that day.  He posted a video to Snapchat of the attack on the U.S. Capitol and can be heard chanting the aforementioned statements while other rioters stormed inside of the U.S. Capitol.  Undeterred, Sarko continued into the U.S. Capitol until he finally entered.

The Court must also consider that Sarko's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions

alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Sarko's participation in a riot that actually succeeded in halting the Congressional certification combined with his celebration and endorsement of the violence on that day renders a sentence of incarceration as opposed to a sentence to probation warranted in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Sarko's conduct and behavior on January 6.

### *Oliver Sarko's Role in the January 6, 2021 Attack on the Capitol*

Sarko drove from his residence in Columbus, Ohio to Washington  D.C. to attend a rally protesting the election results on January 6, 2021. Sarko traveled to Washington D.C. by himself. Initially, Sarko planned to attend the "Sop the Steal."  Upon learning at the rally that attendees would be walking to the U.S. Capitol, Sarko decided to join them.  Upon arriving at the U.S. Capitol,  Sarko proudly recorded himself outside of the U.S. Capitol, exclaiming "We are storming the Capitol out here"; "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"; "We're actually breaking in right now"; and "Fight for Trump!"  Sarko posted the videos taken on January 6 to his Snapchat account for his followers to view.  Indeed, one of Sarko's

followers, Individual-1, he/she observed the videos that Sarko posted on January 6.  According to Individual-1, he/she knew the identity of one additional person, Individual-2, who also observed the video on Sarko's Snapchat page.  Individual-2 also sent the video to Individial-1, although Individual-1 had already independently viewed Sarko's posting.

While standing outside of the building, Sarko observed rioters climbing the walls of the U.S. Capitol attempting to enter the building.  Sarko also observed several police barricades scattered around and knocked over on the U.S. Capitol grounds.  Sarko observed at least one rioter breaking a window affixed to the U.S. Capitol.

The U.S. Capitol was initially breached by the Senate Wing door when a rioter kicked open a window at approximately 2:13 p.m. Upon arriving at the U.S. Capitol, Sarko made his entry into the U.S. Capitol, first being captured on CCTV surveillance footage entering through a doorway near a Senate Wing door at approximately 2:35 p.m.

 In his post-arrest interview, Sarko recounted the smell of tear gas  as he entered the building.  Upon entering, Sarko took pictures of the crowd of rioters inside of the building.  Closed Circuit Television (CCTV) surveillance obtained by law enforcement officials captured Sarko entering the U.S. Capitol.



*Figure A*



*Figure B*



*Figure C*

Walking down the hallway, Sarko entered S-140, the hideaway office of Senator Jeff Merkley of Oregon. Sarko took photograph of himself   First, Sarko Merkley, where he stayed for approximately twelve minutes.  While the office was not labeled as Senator Merkley's, the office was clearly a private office, with personal mementos on the walls and typical office furniture.



*Figure D*

6



*Figure E*

Sarko was not the only rioter inside of Senator Merkley's office. Other rioters who entered

the office vandalized and disrupted the contents of the office, some even smoking marijuana

cigarettes inside of the office.[2]  Collectively, the rioters who invaded the office throughout the

day—when it should have been a workspace for a Senator during the certification of the Electoral

---

[2] The Government's Sentencing Memorandum in *United States v. Felipe Marquez*, 21-cr-136 (RC), ECF No. 28 at 8, describes how Marquez entered Senator Merkley's office at around 3:00 p.m., shortly before Bonet did, filmed other rioters smoking in the room, and himself smoked from a vape pen.  Defendant Brandon Fellows also described how "I walked in there's just a bunch of people lighting up in some Oregon room…they were smoking a bunch of weed in there."  Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Brandon Fellows,* No. 21-cr-83 (TNM), ECF No. 1 at ¶ 15.  *See also,* the Government's Sentencing Memorandum in *United States v.  James Bonet*, 21-cr-00121 (EGS), ECF No., describes how Bonet entered Senator's Merkley's office and smoked a marijuana cigarette inside of the office.

College vote—prompted Senator Merkley to post a video at 11:36 p.m. that night chronicling the damage to his office. The three-minute-long video, available on Twitter at https://twitter.com/SenJeffMerkley/status/1347039504528498688 (Exhibit B), was rebroadcast by major news outlets.

In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked. He pointed out how the floor was littered with debris. He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall. He said that the rioters "left a Trump flag here to mark their presence." Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor. In Senator Merkley's words, one could "count this office trashed."

Sarko did not disturb any items inside of the office and was only inside of Senator Merkley's office for twelve minutes before exiting the office into the adjacent hallway. All the while, he continued to document his way through the U.S. Capitol by taking photographs and videos.

After leaving Senator Merkley's Office, Sarko entered S-145. Numerous rioters congregated inside of the conference room, which is used for visiting spouses of U.S. Senators and members of the House of Representatives. This room, like Senator Merkley's Office, was a private room, not open to the general public.



*Figure F*

Sarko remained inside of the room for approximately five minutes before exiting the room. In his post-interview statement, Sarko exited the U.S. Capitol by either climbing through a broken door or window close to the Senate Wing door that he entered. Sarko was inside of the U.S. Capitol for approximately twenty minutes.

*Social Media Posts*

After leaving the Trump rally, Sarko recorded his walk from the rally to the U.S. Capitol and posted the video recording to his personal Snapchat account. *See* Exhibit A.

In the aftermath of January 6, the Federal Bureau of Investigation (FBI) obtained social media records from Sarko's Snapchat account with the handle name, "osark21." Photographs and videos that Sarko recorded on January 6 and then "live streamed"[3] to Snapchat, a widely used

---

[3] The term "live stream" means "to stream digital data (such as audio or video material) that is delivered continuously and is usually intended for immediate processing or playback." *See* https://www.merriam-webster.com/words-at-play/what-does-live-stream-mean

social media platform, meant that anyone, including other January 6 rioters, were able to view those photographs and videos during the riot.

Sarko also documented himself standing outside of the U.S. Capitol, proudly livestreaming himself and rioters chanting and screaming outside of the U.S. Capitol, as shown in the screenshot of that video, below.



Sarko live streamed video from outside of the U.S. Capitol. There, he described the "storming" of the U.S. Capitol and the damage being done to the exterior of the building by other rioters. *See* Exhibit A.



Despite observing the damage occurring outside of the U.S. Capitol, Sarko continued to enter the U.S. Capitol.  He boasted about his entry.  Once inside, Sarko recorded a video with the caption "I'm in." Sarko then stated, "Where are the traitors?" "Bring out Pelosi!" "We won't let you steal this country." "We're actually breaking in right now." "Fight for Trump!" "Beijing Biden will never be president, we reject communism." *See* Exhibit A.

Because Sarko was live streaming his incendiary remarks to Snapchat, anyone else who accessed Snapchat, potentially millions of persons,[4] including other January 6, rioters, could have listened to those remarks when they were made. Sarko's demands to "bring out" Nancy Pelosi, the Speaker of the House, and to find the "traitors" were particularly chilling because they could have been seen as a call to arms to other rioters to take violent action inside the Capitol. Sarko's posting

---

[4] In 2020, there were almost 347.3 million monthly Snapchat users worldwide. *See* https://www.statista.com/statistics/552671/snapchat-app-dau-region/

of the live stream to Snapchat demonstrates that he wanted to share with others that the police were outnumbered and overcome by the rioters.



Sarko has admitted that at the time he entered the U.S. Capitol he did not have permission to do so, and that he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Oliver Sarko's Interview*

Sarko voluntarily agreed to a post-guilty plea interview with the FBI, which took place on January xxx, 2022. During the interview, Sarko admitted to his conduct and provided details to law enforcement regarding how he traveled to Washington D.C., what occurred, and what he observed upon arriving at the U.S. Capitol.  Sarko also described his conduct inside of the U.S. Capitol.  The government believes that Sarko was honest and forthright in his post-arrest interview.

*The Charges and Plea Agreement*

On April 7, 2021, Sarko was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(C)(D) and (G). On April 30, 2021, he was arrested at his home in Ohio. On September 22, 2021, Sarko was charged in a one-count Information with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On November 9, 2021, Sarko plead guilty to the Information. By plea agreement, Sarko agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Sarko now faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Sarko faces up to six months of imprisonment and a fine of up to $5,000. Sarko must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C.  § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.  Indeed, in his post-arrest interview, Sarko stated that her personally observed violence outside of the U.S. Capitol when he observed  a rioter break a window to enter the building.  Additionally, Sarko admitted that when he approached the Capitol, he smelled tear gas emanating from inside the building – a signal that the rioters were not permitted inside of the U.S. Capitol.

Additionally, this Court should assess Sarko's own conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include:  (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media;

(8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Sarko personally engaged in violence or property destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Sarko's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

When Sarko ascended the steps of the U.S. Capitol, he observed rioters breaching the building and entering the building by destroying the property.  Despite observing the damage and the rioters' violent entry into the U.S. Capitol, Sarko continued to make his way inside the building. Sarko has since admitted to knowing that he did not have permission to enter the U.S. Capitol.

Sarko celebrated the violence and his entry into the building by posting to Snapchat, "People are storming in through the windows and the cops can't do anything there's too many of us."  By posting the video to Snapchat, he clearly sponsored the content. While Sarko himself did not participate in any of the physical damage or the physical attack of officers, he observed the damage to the building, celebrated the violence, and entered the U.S. Capitol.

Sarko entered the building in spite of observing the damage and unauthorized entry of the rioters.  Sarko observed a rioter violently smash a window affixed to the U.S. Capitol.  He walked past the damage and entered the building. He would have heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Sarko believed that tear gas had been deployed prior to making entry inside of the building, but instead moved forward inside of the building.

Prior to entering the building, Sarko chanted violent statements such as "Bring out Pelosi!" This statement presumably advocated for violence to the Speaker of the House. Saeko's social-media narration of his journey to the U.S. Capitol is an aggravating factor.

Additionally, as members of Congress and their staffs hid nearby, Sarko entered a nonpublic office, Senator Merkley's Office, which had been forcibly entered and ransacked. Senator Merkley took a break from the certification to document the damage that had been caused in his office. *See* Ex. B. Even if Sarko himself was not the individual directly responsible for the scroll ripped from the wall, or the debris strewn across the floor, his actions in Senator Merkley's office contributed to a lawless atmosphere there, potentially emboldening others to feel comfortable causing damage as they pleased.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Sarko's History and Characteristics

Sarko's criminal history consists of a 2014 misdemeanor conviction for shoplifting in Ohio, a 2017 felony conviction for attempted illegal conveyance or possession of a deadly weapon in a school safety zone, and a misdemeanor obstructing official business in Ohio.  PSR ¶¶ 24 and 25. In 2019, Sarko was arrested in West Virginia for driving a vehicle while in an impaired state, but with a low alcohol concentration. AAdjudication was delayed and subsequently dismissed when Sarko completed the Motor Vehicle Alcohol Test and Lock Program.  PSR ¶ 28.

At the time of his arrest for this offense, Sarko was employed.  In January 2022,  he took a job as a "floor hand" for Deepwell Services, an oil field services company. ECF 27 ¶¶ 45-56.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Sarko's words and conduct on January 6 demonstrate the need for specific deterrence. Sarko celebrated the violence of January 6 by posting video of the chaos to his personal Snapchat page. He proudly exclaimed that he was "storming the Capitol" and that police were outnumbered by the mob rioters. He lauded the unauthorized entry of the mob into the building and proceeded to follow suit by making his own entry into the building. Upon entering the U.S. Capitol, Sarko chanted statements such as "Bring out Pelosi!" and "Where are the traitors?" He celebrated his entry into the U.S. Capitol after seeing grounded barricades, and smelling tear gas before entering

the U.S. Capitol, and hearing alarms blaring throughout the building, all visual and audible signs that he and the mob were not authorized to be inside of the U.S. Capitol.  Sarko was undeterred by what he observed.  While inside of the building, Sarko made his way into two rooms, one of which is the office of a U.S. Senator.

The government acknowledges that Sarko has not posted comments about January 6 since that date.  In his post-arrest interview, Sarko expressed remorse for his conduct on January 6. Sarko admitted that going to Washington D.C. to attend the rally was a "bad idea." Although Sarko may have belatedly realized that his conduct on January 6 was criminal, his enthusiastic endorsement of violence on that day calls for a measure of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[7] *See United States v. Anna Morgan-Lloyd*,

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas*

1:21-cr-00164 (RCL) Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Sarko has pleaded guilty to Count One of the Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or

---

*K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on *United States v. Russell James Peterson*, 1:21-cr-00309 (ABJ).  In *Peterson*,  Peterson initiated a live stream after entering the U.S. Capitol. He told whoever was watching his broadcast that "we took the Capitol. The Capitol is ours right now."  Peterson bragged about going inside of the U.S. Capitol to help "take" the Capitol.  The Court also considered statements made by Peterson after he left

the U.S. Capitol – statements in which he bragged about "storm[ing] the castle" and "br[eaking] into the chambers" to "smoke a blunt on the couch."  After considering Peterson's comments, the Court sentenced him to a period of thirty days of incarceration.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration, one year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Bonet smoked marijuana; Ericson took a beer from a mini-fridge. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  Like Bonet, Ericson posted his involvement to social media. *Id.* at 4. Like Bonet, Ericson was aware of the crowd outside. See id. at 3, 7-8, 13. The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing—unlike Bonet, who lit a joint. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Like Bonet, however, Mazzocco took smirking photographs of himself during the riot. *Id.* at 2, 12. He was also aware of the crowd outside the Capitol and entered through the Senate Wing Door not long before Bonet did. *See id.* at 3, 7-8, 13.

Another defendant who entered an office space, Charles Pham, also recently received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Bonet's: he saw confrontations between rioters and police before entering; he yelled "we're taking the house back!," he was inside the building for approximately 20 minutes. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no

criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

Here, there is no doubt that Sarko's conduct on January 6 is significant. Sarko breached the U.S. Capitol with complete disregard for the fact that he was unauthorized to enter the building. This breach occurred while Sarko observed damage being committed by another rioter attempting to make entry. Sarko ignored the destructive conduct as well as the visible and audible signs that he and other rioters were unauthorized to enter the building. While outside of the building, Sarko chanted incendiary language such as "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"; "We're actually breaking in right now"; and "Fight for Trump!" While inside of the building, Sarko continued to yell and chant inside while mayhem and chaos surrounded him, and entered two private spaces, including the office of Senator Merkley, an office that was vandalized by rioters. And while Sarko did not participate in that vandalism, he was initially proud of his conduct as evidenced by him livestreaming his attendance on Snapchat. He has since expressed remorse for his conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Oliver Sarko to thirty days incarceration, three years' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/ *Brittany L. Reed*
BRITTANY L. REED
LA Bar No. 31299
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Office: 504-680-3031
Brittany.Reed2@usdoj.gov