```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
 4               Plaintiff,              1:21-cr-00591-CKK
                                         Friday, April 29, 2022
 5     vs.                               10:01 a.m.

 6     OLIVER LOUIS SARKO,

 7               Defendant.
       - - - - - - - - - - - - - - - x
 8
 9     _____

10                  TRANSCRIPT OF SENTENCING HEARING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:        BRITTANY LASHAUNE REED, ESQ.
                                      U.S. ATTORNEY'S OFFICE
14                                    650 Poydras Street, Suite 1600
                                      New Orleans, LA 70130
15                                    (504) 680-3031
                                      brittany.reed2@usdoj.gov
16

17     For the Defendant:            MARK M. ROLLINS, ESQ.
                                      ROLLINS & CHAN
18                                    419 Seventh Street, NW
                                      Suite 405
19                                    Washington, DC 20004
                                      (202) 455-5610
20                                    mark@rollinsandchan.com

21
       Court Reporter:               Lisa A. Moreira, RDR, CRR
22                                    Official Court Reporter
                                      U.S. Courthouse, Room 6718
23                                    333 Constitution Avenue, NW
                                      Washington, DC  20001
24                                    (202) 354-3187

25
```

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Criminal Case 21-591, *The*

3    *United States vs. Oliver Sarko*.

4              Counsel, would you please identify yourself for

5    the record starting with the government.

6              MS. REED:  Good morning, Your Honor; AUSA Brittany

7    Reed on behalf of the United States.

8              THE COURT:  Good morning.

9              MR. ROLLINS:  Good morning, Your Honor; Mark

10   Rollins for Oliver Sarko.

11             THE COURT:  Okay.  Good morning, sir.

12             THE PROBATION OFFICER:  Sherry Baker, on behalf of

13   the probation office, Your Honor.

14             THE COURT:  All right.  Good morning.

15             And I see Mr. Sarko.  Good morning, Mr. Sarko.

16             THE DEFENDANT:  Good morning, Your Honor.

17             THE COURT:  All right.  Let me start.

18             We're here for a sentencing.  Let me ask if you're

19   willing to proceed by video?

20             THE DEFENDANT:  Yes, I am, Your Honor.

21             THE COURT:  All right.  Mr. Sarko pled to Count 1,

22   parading, demonstrating, or picketing in a Capitol building.

23   The statutory maximums are six months in jail, maximum fine

24   of $5,000, five years maximum probation.  There's no

25   supervised release.  The advisory sentencing guidelines do

1        not apply.

2                I have a presentence report, the government's

3        memorandum in aid of sentencing, and the defendant's

4        sentencing memorandum.

5                I have the Pretrial Services report, which

6        indicates that he's in compliance.

7                There were -- in terms of objections, I think this

8        was related to information regarding a West Virginia -- it's

9        not a driver's license, as I understand it, but it's a West

10       Virginia criminal record number in the NCIC database.  So I

11       understand he doesn't have a driver's license, but it's a

12       different -- the number is different, so I don't think you

13       need to change it.

14               Mr. Rollins, are you still objecting?

15               MR. ROLLINS:  No, Your Honor.

16               THE COURT:  Okay.  So those parts of the

17       presentence report are undisputed.

18               Findings of fact.  Pursuant to Federal Rule of

19       Criminal Procedure 32(i)3(A) are my findings of fact.  There

20       appear, at this point, no disputes with the presentence

21       report so I'll adopt the report as written.

22               At this point I will -- since we don't have

23       advisory sentencing guidelines, I've already indicated what

24       the maximum statutory proceedings are and the fact that

25       there's no advisory sentencing guidelines to discuss.  I

 1    will say that there's no supervised release.

 2            There is a controversy, to some degree, in terms

 3    of differing opinions as to whether you can do a split

 4    sentence, which would be a period of jail time and then a

 5    separate sentence of probation; so it would not be a

 6    condition of the probation -- of jail time, but two separate

 7    sentences.  Different judges have -- it's an issue that is

 8    still being litigated at this point.

 9            And so let me hear from the government, defense

10    counsel, and the defendant, if Mr. Sarko wishes to address

11    the Court.

12            So let me start with the government.

13            It wasn't clear to me -- according to Mr. Rollins,

14    it sounded like you might have been changing your position,

15    but I did receive the additional memorandum, which I asked

16    for, which related to the issue of whether you could or

17    could not do split sentences, which I did -- so I have that

18    material.

19            So it wasn't clear to me whether you were still --

20    whether you were asking for -- changing it to home

21    confinement or you were still asking for a split sentence.

22    So if you could address that, among other things, Ms. Reed.

23            MS. REED:  Yes.  Good morning, Your Honor.

24            So yes, Your Honor, the government is requesting

25    that a split sentence be imposed in this case with

1    incarceration.  I had spoken to Mr. Rollins and had

2    apologized about some confusion from a previous

3    recommendation that was made in-house that I had made to my

4    office forgetting that we had, after evaluating the case

5    further, decided that we were not going to be making a

6    recommendation for home detention.  I corrected that

7    information with Mr. Rollins in a separate email to inform

8    him that the government was, indeed, asking for a sentence

9    of incarceration and a split sentence in this case.

10           So my apologies, Your Honor, if that confused the

11   Court as well as Mr. Rollins and Mr. Sarko.  My apologies

12   for that.

13           Your Honor, we are here this morning asking for a

14   sentence of 30 days incarceration followed by a term of

15   probation.  Given the nature and circumstances of the

16   offense, largely what happened on January 6th, Your Honor,

17   we know, is larger than Mr. Sarko.  And when I say that, I

18   want to be clear in the fact that Mr. Sarko is not alleged

19   to have assaulted any police officers on January 6th.  He is

20   not alleged to have committed any damage.

21           As this Court knows, he was in two sensitive areas

22   inside of the Capitol, that being Officer -- I'm sorry --

23   Senator Merkley's office as well as the Spouses' Lounge at

24   the Capitol.  But to be clear, the government is not

25   alleging that Mr. Sarko committed any damage.

1          By my own account and my own conversations with

2     Mr. Sarko, I do believe that he has expressed remorse.  He

3     has been cooperative with the government to the extent that

4     we requested to meet with him.  He did voluntarily meet with

5     us and shared information with us beyond, I think, what the

6     agents knew when they initially arrested him, and that was

7     specifically as it related to his own culpability.  So we do

8     believe that he is genuinely remorseful and expressed

9     contrition in this case.

10          But, Your Honor, going back to the conduct that

11    happened on January 6th, it is important for this Court to

12    consider, when we're asking for a split sentence, why we

13    think that this is a case that does merit incarceration.

14          And, you know, when I initially took a look at

15    this case and in my conversations with Mr. Rollins, I have

16    to admit that I had not had the opportunity to listen to and

17    observe the video that had been posted by Senator Merkley as

18    it related to what happened inside of his office.  And I did

19    think that that was a changing point for myself even though,

20    again, Mr. Sarko was not a participant in any of the damage

21    that happened inside of Senator Merkley's office.

22          But I think that that points to a larger aspect of

23    what happened and just the severity of the acts that

24    happened on January 6th, and it's impossible to exclude

25    Mr. Sarko's conduct from that.

1         Your Honor, as I outlined in the government's

2    memorandum, Mr. Sarko saw one of the initial breaches.  He

3    would have been very close in time to the Senate Wing door

4    when that initial breach happened.  He was not in the first

5    round of individuals who entered, to be clear; however, he

6    was close enough with the individuals who did enter to -- by

7    the time he entered to have heard the alarms blaring inside

8    of the building, to have seen the police officers overcome,

9    and instead he decided to walk in.

10        At no point did he decide to turn around, despite

11   seeing the mob of rioters who were entering inside of the

12   Capitol.  And unique to Mr. Sarko, along with some of the

13   other individuals who I mentioned in my sentencing memo, he

14   did enter into two sensitive areas inside of the Capitol.

15        Now, I know that Mr. Sarko may not have known

16   initially that when he entered Senator Merkley's office

17   that it was, in fact, Senator Merkley's office.  I don't

18   think that was his plan when he went into the Capitol on

19   that day.  However, when he entered in that office he should

20   have seen -- it should have been reasonable to know -- that

21   that was an office building of someone.  Particularly there

22   were personal mementos of the senator in that office.  There

23   was office furniture.  There were sensitive materials.  And,

24   again, not saying that Mr. Sarko did anything to disturb

25   those, but certainly, Your Honor, this was a protected

1   space.  This was someone's work space where they go every

2   day, and they intend that that space is going to be

3   sensitive and private.  And that was disrupted on that day,

4   and Mr. Sarko played a role in that.

5           Other cases where individuals have gone into the

6   senator's office and have gone into other individuals'

7   offices, those individuals have received a term of

8   incarceration, albeit there were two individuals, I believe

9   in the *Edwards* case and *Marquez* case, where this Court did

10  not impose a sentence of incarceration, but those

11  individuals, I think, can be distinguished for the reasons

12  that the government pointed out in its sentencing

13  memorandum.

14          In addition, Your Honor, going into the two

15  sensitive areas that the government is highlighting, it is

16  very troublesome to hear some of the rhetoric that Mr. Sarko

17  did speak on that day.

18          Obviously, Your Honor, the government understands

19  that individuals have the right to certainly espouse their

20  personal views, Your Honor, and certainly we are not trying

21  or in any way asking for a period of incarceration to, I

22  guess, penalize Mr. Sarko for his political stance.  But

23  when that stance does include entering into the Capitol and

24  certainly, before entering, advocating for -- asking "Where

25  is Pelosi?" in a reference to Speaker Pelosi, that is very

1    damaging rhetoric.  We certainly believe that it added to

2    the heightened situation of that day and the seriousness of

3    the situation.  And so all of those factors, Your Honor, are

4    why the government is asking for a period of incarceration.

5            In addition, Your Honor, I think that it is also

6    worth pointing out that Mr. Sarko does have a criminal

7    history that has been highlighted in the PSR, and I want to

8    be clear that I know that some of those are misdemeanor

9    offenses.  And I stand to be corrected -- I did cite in my

10   sentencing memo that one of them may have been a felony, and

11   I was referencing the weapon in a school zone, but I may

12   stand corrected on that by probation, if it is not.

13           Nonetheless, Your Honor, looking at his criminal

14   history, which includes a shoplifting conviction in 2014,

15   and the weapons in a school zone and obstructing an official

16   business, the government does have concerns about specific

17   deterrence and whether Mr. Sarko is going to be someone --

18   in the next political campaign where things may or may not

19   go his way, that he may not exhibit some of the same conduct

20   again.

21           But I will end by saying, again, that Mr. Sarko

22   has been, I think, very remorseful.  He has certainly

23   expressed that to myself as a prosecutor in this case, and I

24   did want to highlight that for the Court as well.

25           But, Your Honor, we do believe that a split

1    sentence is appropriate in this case.  I certainly know that

2    from a legal standpoint Your Honor takes a different

3    position on that.  Obviously we --

4         THE COURT:  Well, I did in a specific case.  It

5    depends on the briefing.

6         MS. REED:  Okay.  So, Your Honor, just to point

7    out, however, though, that there is a Fourth Circuit case,

8    which I know Your Honor is familiar with, that does allow

9    for the imposition of a split sentence for petty offenses.

10   And so, Your Honor --

11        THE COURT:  It was related just -- of the two,

12   Judge Lamberth has far more elaborate analysis than the

13   Fourth Circuit one did, frankly.

14        MS. REED:  That is correct, Your Honor.

15        THE COURT:  So Judge Lamberth has taken the same

16   position as the Fourth Circuit but with a good deal more

17   analysis.

18        MS. REED:  That is correct, Your Honor.  And so

19   not to recite everything that is in my sentencing memo

20   because I know that it was very long, I will just say once

21   again, Your Honor, that the government believes that this is

22   a case where incarceration should be imposed followed by a

23   period of probation so that this Court can have supervision

24   over Mr. Sarko for a period of time to ensure that he is

25   compliant.

1          Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Rollins.

3          MR. ROLLINS:  Yes.  Thank you, Your Honor.

4          So looking at this case -- and I'm just kind of
5     going through the factors.  And the first factor is the
6     nature and circumstances of the case.

7          This is a case in which Mr. Sarko entered the
8     northwest side of the Capitol.  He entered that section, I
9     believe, at 2:35.  The first breach of that section occurred
10    at 2:12 in the afternoon, so we have 2:12.  At the time that
11    he entered that section -- and I'm not making light of what
12    was happening there.  Obviously Mr. Sarko and everyone else
13    agrees that this is wrongful conduct.  At the time there
14    were no police officers within -- on that section when he's
15    going up the steps.

16          But he enters the Capitol knowing that -- you can
17    see the broken windows.  You can see the broken windows.
18    You can see the areas, and, Madam Prosecutor is correct, you
19    can actually hear the alarm sounds going off when he goes in
20    at 2:35.

21          He's in the building for less than 20 minutes, and
22    while he's in that building, yes, there is no engagement
23    with the police officers.  There's no engagement with
24    violence.  No engagement with destruction of property.

25          And so we have a young man, 27 years of age,

1       who -- and I think Madam Probation Officer is correct, these

2       are all -- he has two priors that are misdemeanors from

3       different jurisdictions.

4              Notably are the history and characteristics of

5       him.  He's been employed almost all of his life.  The minor

6       misdemeanor offenses that he incurred in the past, I mean,

7       they all occurred -- the Court is well aware there's

8       statistical data regarding individuals -- that's not to say

9       Mr. Sarko is actually old.  I mean, he's not that much older

10      now, but I think the data indicates that individuals -- the

11      impulsivity of people making decisions when they're younger,

12      that's clearly -- his two prior misdemeanors were

13      substantially when he was younger.

14             And even this case, when we really look at the

15      background of this case, what Mr. Sarko was doing -- the

16      traveling to Washington, D.C., the impulsivity of the

17      decisions that are made that day, going into the Capitol

18      when you're seeing the broken windows -- that's all kind of

19      this immature kind of behavior that is kind of still in the

20      realm of Mr. Sarko's juvenile kind of behavior.

21             But the biggest issue I have with these cases --

22      and I think this is my fourth case dealing with the January

23      6th cases -- is the U.S. Attorney's Office/Department of

24      Justice distinguishing between what qualifies as a felony,

25      what qualifies as jail time, what qualifies as to what the

1    appropriate punishment is.  We have across the board -- and

2    I think the Court is well aware of all the individuals now

3    who have been sentenced under this.  But we also have

4    individuals who were charged with felony offenses for doing

5    the exact same thing as well.  And what is the criteria

6    that's being used to make the determination of whether

7    someone goes to jail on these cases?

8            Looking at what Mr. Sarko's behavior was on this

9    case, if we really just look at what his behavior was, he

10   literally trespassed on the Capitol.  Absent doing that,

11   there was no other activity, no other behavior that he did

12   other than he was trespassing.  He should not have been on

13   that property at the time.  It was a restricted area.  Mr.

14   Sarko realizes that.  He knows that he shouldn't have been

15   on the Capitol at that time.

16           But, again, when we look at what his direct

17   actions were on that day, given the fact that there was no

18   violence and there was nothing that he broke -- and yes, he

19   said some things on social media that, in retrospect, he

20   knows that's completely inappropriate.

21           Mr. Sarko now looks back on this time in his life,

22   and he's embarrassed by it.  And I think most people now,

23   when they look back on it, not realizing at the time that

24   they were engaged in it, that he was literally in this mob

25   mentality.

1          When he looks back on it now, he's just -- he's

2     baffled by his behavior, and I think Madam Prosecutor's

3     correct that he is significantly remorseful now.  He

4     understands that what he did was wrong.

5          And he met with the FBI.  He sat down.  He did

6     every briefing.  He did everything he was required to do

7     after he realized the mistakes that he made.  This is not a

8     case in which -- Mr. Sarko took the first available plea.

9     He wasn't trying to fight this.  He knew that his actions

10    were wrong.

11         The only thing I think the Court -- which the

12    Court is left with is trying to distinguish between how we

13    separate each one of the individuals that was charged here.

14    What is the appropriate sentence given the conduct?  And you

15    have some history with other individuals who have been

16    sentenced.

17         The rationale, why we're requesting a probationary

18    sentence, is twofold.

19         One is that I think the Court gets more of the

20    bang for its buck by placing individuals on a lengthy period

21    of probation, and that way there's monitoring.

22         In a case like Mr. Sarko, where he is such a young

23    man, I think the Court would benefit and society benefits

24    from the ability to supervise him well into the future to

25    make sure that -- we're going to have more elections.  This

1    country is still -- we still have this diverse political

2    environment.  And so I think it's necessary for the Court to

3    continue to supervise and make sure that individuals are

4    abiding and doing what they're supposed to do and that

5    there's some benefit to that.

6          The second is that -- the second reason why we're

7    asking for a probationary sentence is what do we get out of

8    placing Mr. Sarko in jail for 30 days other than the

9    straight punishment?  The straight punishment, which the

10    Court can impose, as we indicated in our presentence report,

11    in our memorandum, is that this Court could impose a lengthy

12    period of community service where Mr. Sarko gives back to

13    the community.

14          He's a young man.  He's clearly -- he's

15    intelligent.  He has the ability -- he's worked all of his

16    life.  So the mere fact that he can give back and he can

17    continue -- and it's no small feat if this Court imposes

18    somewhere in the range of 100 to 120 hours of community

19    service over the next three years.  That's no small feat.

20    And he would be giving back to the community rather than

21    taking by placing him for 30 days in jail.

22          So we think that that should be significant

23    punishment, the punishment of being on this Court's

24    probationary period for a lengthy period of time with that

25    community service where Mr. Sarko has given back to the

1   community and recognized what he's done is wrong.

2          So I would implore this Court to reject the

3   government's position that a 30-day -- and I think they

4   weren't even -- initially I think they were just asking for

5   a 30-day straight sentence.  I understand now they're asking

6   to continue on with probation after that, but I think

7   initially I think she indicated that they just wanted 30

8   days.

9          But I think that would be -- I still would implore

10  this Court to impose a probationary sentence with the

11  punishment of community service as the punishment here, and

12  that's our recommendation.

13          THE COURT:  All right.  Mr. Sarko, you can address

14  the Court as well.

15          THE DEFENDANT:  Okay.

16          Your Honor, I just want to repeat, again, that I

17  truly am sorry about this, and I -- I know I've embarrassed

18  myself and my family.  I've lost friends because of it.

19  It's been one of the hardest years of my life just

20  struggling with the anxiety of this.

21          I'm sorry, my phone is going a little --

22          THE COURT:  Whoops.  There we go.

23          THE DEFENDANT:  And I just want to apologize to

24  Senator Merkley.  I genuinely did not know that it was --

25  what kind of office or anything.  I don't even think I went

1  fully in.  I just poked my head in.  And I don't know -- it

2  obviously wasn't on purpose.  I don't even know if he's a

3  Republican or Democrat.  I've never heard of him, but...

4          And in regards to -- sorry -- Ms. Reed or the

5  prosecutor, how she mentioned that I would have seen police

6  being overcome by the crowd, I did not see any -- I did not

7  see that.  I remember seeing a few police officers, and they

8  were kind of just standing there and not arresting people.

9  That's -- if I would have seen them arresting someone, I

10  would have been too scared to go in because I -- when I went

11  in I wasn't thinking that I could get arrested or anything.

12  I thought that, you know, since all these other people were,

13  I could get out.

14          But I know that kind of sounds like I'm making an

15  excuse, and I don't want to do that.  I know that I was

16  wrong to go in, and I just -- I'm sorry.  I'm really

17  nervous.

18          But I just want to make it clear that I really am

19  sorry about this, and I, in the future -- I've already taken

20  a step back from worrying about politics, and I don't get

21  into it anymore as much because, you know, I don't want to

22  try to get riled up about things that I can't control

23  anymore.  I've been focusing more on my faith and my

24  religion and just putting it in God's hands and stuff than

25  worrying about things like that.

1    Yes, that's all that I can think of.

2    THE COURT:  All right.

3    Why don't you give me five minutes.  Let me just,

4    you know, look for a couple of minutes.

5    Please stay.  Don't disappear on me because it's

6    hard to get this back.  I'm just going to stop the video for

7    a second.  I want to check on something, and then I'll come

8    back.

9    So it's 25 after 10:00.  At 10:30 I'll be back,

10   and I'll go forward with the sentencing.  So you can either

11   sit there or, you know, stop the video, but please don't get

12   out of the Zoom since it's -- I don't want to have a problem

13   of getting everybody back again, okay?

14   THE DEFENDANT:  Okay, Your Honor.

15   (Recess taken)

16   THE COURT:  All right.  I'm back.  Let's see if we

17   can get others back.

18   All right.  I believe we have everybody, including

19   the court reporter.  Lisa, are you there?

20   THE COURT REPORTER:  I am here, Judge.  I'm sorry.

21   THE COURT:  Okay.  No problem.  I know you have

22   been muted.  I just wanted to make sure there was no

23   problem.

24   So let me proceed.

25   The Court considers the pleadings, the arguments,

1    the record in this case, in addition to the following

2    information in determining a fair, appropriate, and

3    reasonable sentence in conformance with the factors set out

4    by statute in 18 USC 3553(a) and subsequent sections except

5    for (e).

6              Mr. Sarko is 27 years old.

7              In terms of a criminal history, in 2014 a

8    shoplifting.  He received a fine and restitution.  He paid

9    restitution and court costs.

10             There was an incident at a school, attempted

11   conveyance or possession of a deadly weapon in a school

12   safety zone and obstructing official business.  Again, he

13   received a fine and court costs.

14             There's an arrest for driving while impaired in

15   terms of alcohol, and he was put in -- there was, I guess,

16   an informal sentencing.  It's not quite clear to me whether

17   it was a prejudgment or whatever, but at any rate he needed

18   to complete an alcohol program, which he did, and the case

19   was dismissed.

20             Also was dismissed was the driving while his

21   license was suspended, and I think it was a result of the

22   earlier arrest in terms of driving while impaired.  But

23   those are -- both those cases have been dismissed.

24             In terms of education, he's a high school graduate

25   and a National Merit Scholar.  I have to say, Mr. Sarko,

1    that's really very special.  You're obviously smart.  You

2    know, National Merit Scholars are not a dime a dozen.  There

3    are very few people that reach that.  You should be proud

4    that you were able to do that.

5           You attended Miami University in Oxford, Ohio, and

6    then Ohio State University.  You were two classes away from

7    a bachelor of science degree.  You discontinued your degree

8    after you got a job in 2017.

9           You should consider going back.  You may not need

10   it specifically for your job, but just for your own sake.

11   You're obviously smart.  You're very close to ending it.  At

12   some later point in time you may want to do something

13   different as a job, and it is easier to go back and finish

14   your college now, when you're young, than it is to do it

15   later.  So I would do it.

16          Employment history.  2002 and presently employed

17   for Deepwell Services.  You're what's called a floor hand.

18   You evidently work 90 hours a week for four weeks, and then

19   you're off for two weeks, and that routine starts all over

20   again.  So this was 2022 that you're doing this.

21          In 2019 and 2021 you were a floor hand at another

22   drilling company that was terminated based on or at least

23   what they claim was no safety harness used.  It's your view

24   that was based on this offense, but in any rate, your job

25   was terminated, but you did get another one.

1        2018 to 2019, you were a derrickhand with another

2   drilling company, and then in 2019 you were laid off.

3        And in college you did work at a store warehouse,

4   and you do have -- you do have a work history.

5        Finances, you have a mobile home and a utility

6   vehicle, and frankly, in addition to the restitution, you're

7   going to need to pay a fine.  There's no financial ability

8   to pay a fine in addition.

9        Physical condition.  No issues that I can see.

10  You have had COVID.  You're not vaccinated.

11       Mental health, emotional, there's no issues.

12       Substance abuse.  You finished the alcohol program

13  earlier from that arrest, and I understand you're not

14  drinking now so that's not an issue at all.

15       On a personal basis, you were brought into an

16  intact union.  Your father is a colonel in the U.S. Marine

17  Corps Reserve.  He works at a real estate firm.  Your mother

18  is a counselor at a women's care center.  You have five

19  siblings.  Two have jobs; one is in the Marine Corps; one in

20  college; and one in high school still.  You evidently have a

21  supportive family.  You're not married, and you have no

22  children.

23       You lived with your parents in Columbus, Ohio, in

24  February 2021, so you would have been there at the time.

25  Then you moved to Marietta, Ohio, and you're now living by

1    yourself, as I understand, in a mobile home.

2         You did have four firearms when you were arrested.

3    Your parents evidently are taking care of that.

4         In terms of the statement of the offense, I'm

5    going to go over it in the context of what you actually

6    agreed to as opposed to trying to do summaries.  So I'm

7    going to put it in context in terms of discussing the attack

8    on the Capitol because otherwise the actions don't make any

9    sense.

10        So on January 6, 2021, at the U.S. Capitol there

11   were permanent and temporary security barriers, and U.S.

12   Capitol Police were out there in order to only allow

13   authorized people with appropriate identification into the

14   U.S. Capitol.  And the exterior plaza was closed to members

15   of the public.

16        There was a joint session of the U.S. Congress

17   convened at the Capitol.  During this joint session elected

18   members of the House of Representatives and Senate were

19   meeting in separate chambers to certify the vote of the

20   Electoral College of the 2020 Presidential Election, which

21   had taken place on November 3, 2020.  The joint session

22   began at approximately 1:00 p.m.

23        Shortly, at around 1:30, the House and the Senate

24   adjourned to separate chambers to resolve a particular

25   objection that they had.  Vice President Mike Pence was

1    president and presiding first in the joint session and then

2    he went to the Senate Chambers.

3            As the proceedings continued in both the House and

4    Senate, Vice President Pence, present and presiding over the

5    Senate, a large crowd gathered outside the Capitol.

6    Temporary and permanent barricades were in place around the

7    exterior.  Capitol Police were present and attempting to

8    keep the crowd away from the Capitol building and the

9    proceedings.

10            At approximately 2:00 p.m., certain individuals in

11    the crowd forced their way through, up, and over the

12    barricades and past the officers -- the U.S. Capitol Police,

13    and they advanced through the exterior facade of the

14    building.

15            The crowd was unlawfully authorized to enter or

16    remain in the building.  Prior to entering the building, no

17    members of the crowd submitted to security screenings or

18    weapons checks by the Capitol Police or other authorized

19    security officials.

20            The certification proceedings were still underway.

21    The exterior doors and windows of the Capitol were locked or

22    otherwise secured.  Capitol Police attempted to maintain

23    order, keep the crowd from entering the actual Capitol

24    building; however, shortly after 2:00 p.m. individuals in

25    the crowd forced their way into the U.S. Capitol.  Windows

1    were broken, which was quite obvious.  Certain members of

2    the law enforcement were assaulted as others in the crowd --

3    some assaulted and others encouraged or assisted in those

4    acts.

5           The riot resulted in substantial damage to the

6    Capitol requiring the expenditure of more than $1.4 million

7    for repairs, and you are contributing $500.  Obviously

8    that's -- all of the amount of money is not going to be

9    paid.  It's going to be taxpayer money that is in the

10   process of fixing it now.

11          At approximately 2:20, members of the House of

12   Representatives and the Senate, including the president of

13   the Senate, Vice President Pence, were instructed and did

14   evacuate the chambers.  So at that point the joint session

15   was effectively suspended and did not resume until after

16   8:00 p.m. that day.  In light of the dangerous circumstances

17   caused by the unlawful entry, including the danger posed by

18   individuals who had entered without any security screening

19   or weapons check, the proceedings could not proceed, and it

20   was not until after every unauthorized occupant had left the

21   U.S. Capitol and the building had been confirmed secured

22   that matters resumed at 8:00 p.m.

23          Vice President Pence remained in the Capitol from

24   the time he was evacuated from the Senate Chamber until the

25   session resumed.

1         So we'll get into Mr. Sarko's particular --

2    against that background.

3         So on or about January 6th he came from Ohio.  He

4    traveled to Washington, D.C., to hear then Former President

5    Donald Trump speak.

6         After he attended the rally, he walked to the

7    Capitol building with others.  While walking to the Capitol,

8    Mr. Sarko utilized his phone to live-stream footage of

9    himself walking to the Capitol building, all of which we

10   have.

11        Upon approaching the Capitol building, Mr. Sarko

12   made multiple statements -- I believe mostly on Snapchat --

13   quote, We are storming the Capitol out here, unquote.  Where

14   are the traitors?  Quote and unquote.  Bring out Pelosi;

15   quote and unquote.  We won't let you steal this country;

16   quote and unquote.  Quote, We're actually breaking in right

17   now, unquote, and Fight for Trump.

18        After remaining outside of the Capitol building,

19   he then entered the building without authorization.  He

20   entered the northwest side of the Capitol building through

21   the Senate Wing door.

22        While walking through the building, he entered

23   room S140, which is a Senate office, which was dedicated, as

24   we've indicated, to a particular U.S. senator.  So this was

25   his private office at the Senate.  And Mr. Sarko knew at the

1    time he entered the U.S. Capitol, when he was walking

2    around, that he didn't have permission to either enter the

3    Capitol or parade, demonstrate, or, you know, picket inside

4    of the building.

5            There were some additional statements, but this is

6    the statement that he agreed to.  I think, from discovery,

7    there is -- there are some additional statements that he

8    made.

9            So having gone to Former President Trump's

10   rally -- which was perfectly fine and appropriate.  And when

11   he went to the Capitol, he recorded himself, and we have

12   these -- so this isn't like witnesses; we have his words --

13   "We're storming the Capitol.  Where are the traitors?  Bring

14   out Pelosi.  We won't let you steal this country.  We're

15   actually breaking in right now."  He also smelled tear gas,

16   which certainly put him on notice that he -- you know, that

17   he shouldn't have been in there.

18           The Capitol was breached at 2:13 p.m.  He entered

19   at 2:35, so it wasn't that much later.  He stayed about 12

20   minutes in the senator's office -- we have this so you can

21   tell what the timing is -- there with others.  Others

22   vandalized the office.  He did not, but he certainly could

23   see them either vandalizing it or that it had been.

24           And these were sensitive areas, these private

25   offices.  These never would be open to the public such as

1    perhaps the chambers.  Although they were damaged by others,

2    he certainly was in there.  He was there for 12 minutes.  He

3    was, in total, in the Capitol for about 20 minutes.

4         He also went into the Spouses' Lounge, and, again,

5    this would not be space that the public would ordinarily be

6    allowed into.

7         Now, on Snapchat he evidently live streamed his

8    video.  He called it, quote, Storming the Capitol.  He

9    called out, "Find traitors."  He could see the damage to the

10   outside of the building, certainly the windows at the point

11   that he went in, and that law enforcement was outnumbered.

12   And he said, quote, People are storming in there through the

13   windows, and cops can't do anything.  Too many of us,

14   unquote.

15        So he certainly was aware that the police

16   officers, the law enforcement, Capitol Police and others at

17   that point -- the MPD showed up -- you know, were not able

18   to contain the crowd, and he noted this in his statement.

19        He stayed.  He didn't leave.  He went into the

20   building.  As opposed to staying outside, he went into the

21   building.

22        He didn't involve himself, to his credit, in any

23   violent or destructive acts.  Most of this was his presence

24   and his rhetoric.  He saw damage done, windows smashed,

25   which he, you know, walked through.

1          He pled guilty.  He did not equivocate or lessen

2     in any way his culpability, to his credit.  He did not

3     destroy property, nor did he engage in any assaultive

4     behavior.  All to his credit.

5          Post his guilty plea, he was interviewed.  And

6     like some, he was very honest about his own actions that

7     day, didn't conceal, you know, any evidence, and has shown

8     remorse.  The prosecutor has indicated that and also to the

9     Court.

10          In terms of considering the factors, this is a

11     serious offense.  The goal of this insurrection was to stop

12     the certification of a presidential election and the

13     peaceful transfer of power as guaranteed in our

14     Constitution, and that's the bedrock of our democracy.

15          Your comments on video, Snapchat, state your

16     intent and, frankly, your mindset on that particular day.

17     You may have second thoughts now, but it certainly reflects

18     what you were thinking at the time.

19          You came all the way from Ohio to D.C.  Going to

20     the rally was not a problem, but then, with others, you then

21     followed them.  You had time to think through whether this

22     was a good idea, and, as I said, you're an intelligent

23     person, and you went with others to storm the Capitol to

24     stop the certification.

25          You did not stop outside, you know, and decide not

1       to go in.  You went in, and you stayed in there for, you

2       know, 20 minutes.  I've had people who have gone in and

3       stayed, you know, eight minutes and left.  So your presence

4       in the mob, even though you may not have assaulted anybody,

5       and you may not have destroyed any property, did help create

6       a momentum for violence and destruction of property by

7       others.  You're there.  You're an encouragement by just

8       being there.

9              Having a large number of people, including you,

10      participating in this insurrection provided safety for the

11      violent actors and the violent acts of others because you

12      were overwhelming, certainly, the law enforcement in a

13      large-enough move that it would have been hard to control

14      those who were actually damaging property or, you know,

15      committing these violent acts.

16             And violence is an unacceptable way to resolve

17      potential differences politically.  There are lawful means

18      available in a democracy to change or challenge actions you

19      disagree with, which don't include a violent insurrection.

20      Your presence and actions by joining other insurrectionists

21      was an inexcusable attack on our democracy and peaceful

22      transfer of power, according to the Constitution, and a

23      disrespect for the rule of law which governs civilized

24      societies.

25             As I said, you're obviously intelligent.  You're a

1    National Merit Scholar.  That's quite something to be proud

2    of.  And you're close to getting a college degree, so

3    obviously, you know, you're a good student.

4         You also come from a very supportive family

5    considering you have two people in the military who pledged

6    allegiance to the Constitution and to uphold our government.

7    They have been supportive of you.

8         You should appreciate what an extraordinary

9    country you live in with a vibrant democracy, and I hope you

10   can come to appreciate how lucky you are to live in a

11   democracy as opposed to some other country ruled by an

12   authoritarian or some dictator.  There's certainly enough

13   other examples.

14        It's my hope that my sentence sends a message to

15   you to deter you and others from ever engaging in this type

16   of destructive behavior in the future recognizing that you

17   live in a country with incomparable freedoms which are

18   protected by the rule of law.  When you eliminate the rule

19   of law, then you jeopardize those freedoms.

20        I would also say to you that although you may wish

21   to -- you've indicated a wish to disengage from politics, I

22   wouldn't do that.  I'm not suggesting with this sentence

23   that you do that.  You're a citizen of this country.  You

24   should participate, and you most certainly should vote.  But

25   you need to do it lawfully.  There are ways of lawfully

1   participating in our democracy and expressing differing

2   views that don't involve violence and an insurrection.

3           Now, in terms of parity, we have charts that the

4   government has done.  The court has done them -- court writ

5   large, not just me -- in terms of different sentences.  It

6   gives you some sense of what it is.  It's not fully, because

7   they don't include all of the different factors you might

8   consider.

9           I've been doing my own chart because I've done

10  some sentences.  Obviously whether there's destruction or

11  any kind of injuries to law enforcement is one issue; the

12  length of time that people have been in there, the comments

13  that have been made along the way or other actions within

14  the Capitol, looking at any kind of criminal history.

15          Obviously, you know, you're going to look at

16  remorse and whether somebody has pled guilty, has not

17  equivocated.  Those kinds of things, I think, are things

18  that the Court would take a look at, and I've done my own

19  chart, frankly, with those that I have sentenced in terms of

20  making distinctions.

21          So far my sentences have all involved, like your

22  case, petty offenses.  I have not -- I have felonies and I

23  have felony pleas, but the sentences have not taken place,

24  so I'm looking at sentences that I have looked at within my

25  own.  I realize the government has come up with their own

1     way of looking at it, but I've come up with my way of

2     reviewing it and what I consider.

3          Now, in one of the cases, in the first case that I

4     sentenced -- supervised release is obviously not allowed.

5     The issue that has been out there is whether you can do a

6     split sentence, which would be a period of incarceration and

7     then probation.  It's not clear to me whether you can do it

8     as a condition of probation, but the case -- the two

9     specific cases where there's been any writing about it have

10    been the Fourth Circuit and Judge Lamberth.  Other judges

11    have done split sentences -- in other words, a period of

12    incarceration and probation -- but have not written anything

13    so it's not clear precisely what their thinking is.

14          I know that there's been at least one sentence

15    with an intermittent -- and you can do up to 14 days with an

16    intermittent sentence and then probation, and that nobody

17    seems to be disputing.

18          So although I did do one case early on in terms of

19    a sentence of 90 days and did a probation, I did it as a

20    condition of probation.  It was based frankly on the --

21    although I thought the Fourth Circuit's analysis was not

22    very thorough, I did ask for briefing on it.  It was fairly

23    limited in terms of the review of it, so I made the decision

24    that I did.  It was after the sentence had been imposed

25    going back.

1       Since then we have Judge Lamberth, who has done an

2    excellent job, frankly, of parsing the statutes at issue and

3    going through them very carefully.  The Fourth Circuit is

4    out there as well, although I view them as -- it's obviously

5    not binding, for one thing.  Neither is Judge Lamberth's.

6    But there's certainly -- Judge Lamberth I view as frankly

7    being more persuasive in the fact that he really did a very

8    detailed analysis of the statutes in terms of whether or not

9    you can do split sentences where you would have a period of

10   incarceration and then impose probation.

11       It's obviously somewhat of a contested issue.  At

12   this point I don't think there are any Court of Appeals

13   decisions that have -- nor any appeals, frankly, sitting up

14   there.  The one appeal from my original sentence they didn't

15   pursue.  So we're not going to get, any time in the near

16   future, a Court of Appeals opinion that's going to resolve

17   this, so we're sort of left, as judges, making our own

18   decisions.

19       So I've looked at this very carefully.  I am going

20   to issue a legal opinion.  Trying to do this orally doesn't

21   make any sense, and it does involve parsing carefully the

22   statutes that are at issue.

23       So my decision that comes out is that you can do a

24   split sentence with a period of incarceration and probation

25   in terms of doing it that way, and you can do it more than

1     just for the intermittent period.  I'm going to issue that

2     at the time that I'm going to be doing this.

3          So in terms of looking at how I'm going to

4     sentence Mr. Sarko -- and obviously the issues are

5     serious -- I focused on the seriousness of the offense,

6     which I have gone over in great length.  I've also looked at

7     what would be considered a just punishment and parity, as

8     I've indicated, in terms of looking at things.

9          Deterrence is a big issue, I think, in this

10    particular case, both to him and certainly to others.  We

11    have elections coming up that -- you know, in the future,

12    and I think that the seriousness of the conduct merits

13    taking a careful look and paying attention to deterrence to

14    individuals but equally, and perhaps more importantly,

15    deterrence to others in terms of people taking it seriously

16    and thinking through whether this is the way you proceed in

17    a democracy and this is the way you deal with the rule of

18    law.

19         So pursuant to the Sentencing Reform Act of 1984

20    and the provisions of 18 USC 3553, it's the judgment of the

21    Court, that you, Oliver Sarko, are hereby committed to the

22    custody of the Bureau of Prisons for a term of 30 days on

23    Count 1.  You're further sentenced to serve a term of 36

24    months -- three years -- of probation on Count 1.  In

25    addition, you're ordered to pay a special assessment of $10

1    in accordance with 18 USC Section 3013.

2         While on supervision, you shall abide by the

3    following mandatory conditions as well as the standard

4    conditions of supervision, which are imposed to establish

5    the basic expectations for your conduct while on

6    supervision.  The mandatory conditions include:

7         You must not commit another federal, state, or

8    local crime.  You must not unlawfully possess a controlled

9    substance.  You must refrain from any unlawful use of a

10   controlled substance and submit to one drug test within 15

11   days of placement on supervision and at least two periodic

12   drug tests thereafter.

13        You must make restitution in accordance with 18

14   USC Section 3663 and 3663A or other statutes, and the

15   restitution is in the amount of $500.

16        I'm not going to -- as I said, I gave

17   consideration to community service, but I've decided not to

18   do that since I've given you the 30 days.

19        I find that you do not have the ability to pay a

20   fine and, therefore, waive imposition of a fine in this

21   case.

22        You're ordered to make restitution to the

23   Architect of the Capitol in the amount of $500.  You don't

24   have the ability to pay interest, and so I'm waiving any

25   interest or penalties that may accrue on the balance.  And

1    I'll talk to you in a moment about how that might be done.

2              Restitution and payments shall be made -- you'll

3    pay it to the Clerk of the Court at the district court here

4    in D.C.  It's then disbursed to the Architect of the

5    Capitol, and there is an address where it goes, which the

6    Clerk of the Court will take care of.

7              The financial obligations, which would be the

8    restitution and the $10, are immediately payable to the

9    Clerk of the Court for the U.S. District Court and the

10   address.  Within 30 days of any change of address you'll

11   notify the Clerk of the Court of the change until such time

12   as the financial obligation is paid in full.

13             The probation office shall release the presentence

14   investigation report to all appropriate agencies, which

15   includes the U.S. Probation Office in the appropriate

16   district of residence in order to execute the sentence of

17   the Court.

18             I would have you first report to the probation

19   office here in D.C. and then indicate to them where you plan

20   on living, and then the probation can be transferred.  But I

21   want to make sure that you're connected to probation and you

22   know what your conditions are before, and you can make a

23   decision about where it is that you wish to live.

24             Before I get into the notice of appeal and some of

25   the other things, I do want to indicate that I'm going to

1    let you voluntarily surrender.  I will set a period of --

2    you are not to be -- you will receive a notice -- and

3    probation will talk to you -- from the Bureau of Prisons

4    about where to go.  I'm not sure where they will send you.

5          You do not have to report prior to July [sic] 13th

6    of 2022, so you'll have a six-week period within wish to get

7    your affairs in order.

8          I will be issuing this legal opinion regarding the

9    split sentence.

10          Is there a particular place you wish to recommend,

11    Mr. Rollins?  I will put a recommendation in.  I don't

12    believe he has any credit for -- you know, for time served

13    so there's nothing to put in that.

14          MR. ROLLINS:  Could I submit that to chambers in

15    the next 24 hours?

16          THE COURT:  Okay.

17          The other question that I have is does Mr. Sarko

18    have the $500?  If he doesn't, or if he needs time within

19    which to pay it, I will set out a time -- a schedule for him

20    or a time period.  Usually it's due immediately.  I don't

21    know whether he's got that kind of funding or whether it

22    needs to be set out in a schedule during the probationary

23    period where he'd pay a certain amount each month.

24          Mr. Rollins?

25          MR. ROLLINS:  Mr. Sarko can address that issue.  I

1    don't have -- Mr. Sarko, do you have the $500 today?

2              THE COURT:  Mr. Sarko?

3              THE DEFENDANT:  Yes, I can pay it.

4              THE COURT:  You can pay it?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.  Do you want to have a specific

7    date by which to pay it?  I can give you time to get your

8    money together, I mean, in terms of paying it.

9              THE DEFENDANT:  No, it doesn't -- I can pay it any

10   time.  It's okay.

11             THE COURT:  All right.  Then, when you talk to

12   probation relating to what notice you'll receive about

13   reporting to the Bureau of Prisons, you should talk to her

14   about the restitution so that that gets taken care of and

15   you know how to do it since you're not in the District of

16   Columbia at this point in terms of being able to do it.  But

17   if you can pay it up front, then I would go ahead and do so,

18   and then you don't have that hanging over you.

19             Pursuant to 18 USC Section 3742, you have a right

20   to appeal the sentence imposed by the Court if it's longer

21   than the statutory maximum.  It's not.  If you choose to

22   appeal, you must file any appeal within 14 days after the

23   Court enters judgment.

24             You're going to have a discussion with your

25   counsel as to whether you wish or do not wish to appeal and

1    under what circumstances you could potentially do it.

2              As defined in 28 USC 2255, you also have the right

3    to challenge the conviction or sentence if new and currently

4    unavailable information becomes available to you or on a

5    claim that you received ineffective assistance of counsel in

6    entering the plea or in connection with the sentencing.

7    Again, if you're unable to afford the cost of an appeal, you

8    can request to file it without cost to you, and you can also

9    ask to have counsel appointed to assist you.

10             Pursuant to a decision that came down in 2016, are

11   there any specific objections or things that you wish to

12   bring up that have not already been discussed?  And as I

13   said, I will put out a legal opinion that from my

14   perspective supports the split sentence, which I will do

15   right after the sentencing so that you can take a look at it

16   and make whatever decisions you and Mr. Sarko wish to make

17   about it.

18             So anything -- let me just start with Ms. Baker.

19   Anything we need clarified?

20             THE PROBATION OFFICER:  No, Your Honor.

21             THE COURT:  All right.  Ms. Reed, anything you

22   want to bring up?

23             MS. REED:  No, Your Honor.

24             THE COURT:  Mr. Rollins, anything you wish to

25   bring up?

1          MR. ROLLINS:  No, Your Honor.

2          THE COURT:  Okay.  If you'll let us know where you

3     want -- I don't know what they've been doing with the

4     shorter sentences.

5          I don't know, Ms. Baker, whether you know in terms

6     of the -- with some of these misdemeanors, they've been

7     shorter.  So I'm assuming that they have not been doing it

8     at the D.C. Jail but at facilities around where people have

9     lived or the Bureau of Prisons.  Am I correct?

10         THE PROBATION OFFICER:  Yes, Your Honor.  Some of

11    these cases, BOP, with the shorter sentences, are actually

12    having them serve a sentence in some cases at a local jail

13    to where they reside at.  I've seen that happen in some

14    cases.

15         THE COURT:  Okay.  So I don't -- Mr. Rollins, what

16    you can do is there is -- you probably know this, but I'll

17    just remind you.  There is an office that the Bureau of

18    Prisons -- and Ms. Baker can tell you where it -- you know,

19    how to get in touch with them.  They make a decision about

20    where the person should go; so, I mean, I'll make a

21    recommendation, if you tell me what it is.

22         And you have a choice of a Bureau of Prisons

23    facility or, if there's a local jail that he'd prefer to do,

24    I can make that recommendation.  The sentence is short

25    enough that they may very well just do a local facility as

1  opposed to, you know, a Bureau of Prisons facility, but you

2  can find out from them where they're planning on sending

3  him.

4        So I would go ahead and check once this -- you

5  know, once this goes through.  He'll have six weeks in here,

6  so it won't be any earlier.  I don't know how quickly

7  they're moving.  That has been a work in progress.

8        So I'm not sure how quickly they'll designate a

9  place, but it won't be any earlier than June 13th.  So -- it

10  might be later, but it won't be any earlier than June 13th,

11  so he's got a six-week period in here.  All right.

12        MR. ROLLINS:  Thank you.

13        THE COURT:  So talk to your client in terms of --

14  he knows where he lives, as to what -- you know, if he has a

15  choice, I'm happy to make that recommendation.

16        Mr. Sarko, I'm hoping that, based on what you said

17  today and you thought of, I'm not going to see you back here

18  during these three years of probation.  Take it seriously.

19  You're smart enough.  Finish college.  Have that under your

20  belt.  No matter what you do at some later point, you may

21  want it.  It's easier to do it now, and think it through.

22        But don't disengage from participating as a

23  citizen in this country.  I'm not meant to discourage you.

24  I'm just asking you to do it lawfully.  It's important that

25  everybody participate.  If the democracy is going to work,

1    we all have to.  Just do it lawfully.  All right?

2         Good luck.  Hopefully I won't see you back except

3    under good circumstances, and if there's nothing else --

4    Dorothy, anything else from you?

5         THE COURTROOM DEPUTY:  No, Judge.  You didn't

6    impose any supervised release; is that correct?

7         THE COURT:  No.  Legally you cannot do supervised

8    release so it's strictly 30 days and probation.

9         THE COURTROOM DEPUTY:  Okay.  Thank you.

10         THE COURT:  And 30 days is not a condition of

11    probation.  It's separate.

12         THE COURTROOM DEPUTY:  Okay.

13         THE COURT:  All right.  Take care, everyone.  Be

14    safe.

15         MS. REED:  Thank you, Your Honor.

16              (Whereupon the hearing was

17               concluded at 11:07 a.m.)

18

19

20

21

22

23

24

25

### CERTIFICATE OF OFFICIAL COURT REPORTER

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

**NOTE:**  This hearing was held remotely by Zoom or some other virtual platform and is subject to the technological limitations of court reporting remotely.

Dated this 13th day of June, 2022.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001